IN THE MATTER OF THE ADOPTION OF RUSSELL CLAYTON CUNNINGHAM BY RICHARD ALLEN CUNNINGHAM, MICHELLE LEA CLINE CUNNINGHAM, PETITIONERS

IN THE MATTER OF THE ADOPTION OF SHAWN ALLEN CUNNINGHAM BY RICHARD ALLEN CUNNINGHAM, MICHELLE LEA CLINE CUNNINGHAM, PETITIONERS

IN THE MATTER OF THE ADOPTION OF MEREDITH CHAREE CUNNINGHAM BY RICHARD ALLEN CUNNINGHAM, MICHELLE LEA CLINE CUNNINGHAM, PETITIONERS

No. COA01-1106

(Filed 16 July 2002)

### 1. Adoption— DSS consent—not acknowledged or filed

The trial court's conclusion that DSS had not consented to adoptions was supported by the findings. Although there was conflicting evidence as to whether consent forms had been prepared and signed, there was no evidence that they had been acknowledged under oath or filed as required by statute.

### 2. Adoption— petitions—court's authority to dismiss—best interests of child

The trial court had full statutory authority to dismiss petitions for adoption based on the best interests of the children regardless of whether DSS had previously consented to the adoptions.

### 3. Adoption— best interests of the children—physical discipline and verbal abuse

On a petition for adoption, the evidence supported the trial court's findings of verbal abuse and physical discipline, and the findings supported the court's conclusions that adoption would not be in the best interests of the children.

### 4. Adoption— denial—propriety of certain evidence—sufficiency of other evidence

Even assuming that evidence of the abuse of other children should not have been admitted in an adoption proceeding, other testimony fully supported the critical findings and the court's ultimate denial of the petitions.

**IN RE ADOPTION OF CUNNINGHAM**

[151 N.C. App. 410 (2002)]

**5. Evidence— adoption—juvenile and mental health files of other children**

There was no error in an adoption proceeding in the exclusion of the juvenile and mental health files of foster children who were verbally abused and physically disciplined by petitioners where petitioners failed to show precisely how such evidence would have influenced the trial court's decision. Evidence of favorable treatment of the children would not have negated the plenary evidence of neglect offered during the hearing, and speculation that the files might contain evidence pertaining to veracity is insufficient.

Appeal by petitioners from an order entered 30 March 2001 by Judge Jackie Lee in Harnett County District Court. Heard in the Court of Appeals 5 June 2002.

*Jones and Jones, P.L.L.C., by Cecil B. Jones, for petitioner-appellants.*

*Morgan, Reeves & Gilchrist, by C. Winston Gilchrist, for respondent-appellee Harnett County Department of Social Services.*

*Harrington, Ward, Gilleland, and Winstead, L.L.P., by Eddie S. Winstead, III, for appellee Guardian Ad Litem.*

HUNTER, Judge.

Richard Allen Cunningham and Michelle Lea Cline Cunningham ("petitioners") appeal the trial court's "Order Dismissing Adoption Petitions" entered 30 March 2001 ("the Order"). We affirm.

Petitioners filed petitions for the adoption of three minor children: Russell Clayton Cunningham ("Clayton"), Shawn Allen Cunningham ("Shawn"), and Meredith Charee Cunningham ("Charee"), in accordance with Article 2 ("General Adoption Procedure") of Chapter 48 ("Adoptions") of our General Statutes. The Harnett County Department of Social Services ("DSS"), the agency which had placed the three minor children with petitioners, filed a "Motion to Dismiss Petition for Adoption" for each of the three minor children. The guardian *ad litem* for the three minor children filed a "Motion to Dismiss" in response to each of the three adoption petitions.

Petitioners filed three motions requesting orders dispensing with the requirement that consent be given by DSS. *See* N.C. Gen. Stat. § 48-3-603(b)(1) (2001) ("[t]he court may issue an order dispensing with the consent of . . . an agency that placed the minor upon a finding that the consent is being withheld contrary to the best interest of the minor"). Petitioners also filed a "Reply to Motion to Dismiss" in response to the motions to dismiss filed by DSS, alleging that DSS had previously consented to the adoption of each of the three minor children. Finally, petitioners filed a "Reply to Motion to Dismiss" in response to the motions to dismiss filed by the guardian *ad litem*. The three cases were transferred to district court for a hearing on the motions by orders of the clerk of court.

Following a hearing on the motions, the trial court entered an "Order Dismissing Adoption Petitions." The trial court found and concluded: (1) that petitioners had not offered competent evidence that DSS had executed written consent for adoption by petitioners in accordance with N.C. Gen. Stat. § 48-3-605(d) (2001); (2) that DSS had removed the three minor children from petitioners' home on 28 August 2000 following a report by petitioners' neighbor that Mr. Cunningham had verbally assailed and physically assaulted a foster child living in petitioners' home; (3) that the petitioners' home environment would be injurious to the physical and emotional well-being of the three minor children; and (4) that adoption by petitioners would not be in the best interests of the three minor children. Thus, the trial court: (1) denied petitioners' motions to dispense with the requirement that DSS consent to the adoptions; (2) granted the motions by DSS and the guardian *ad litem* to dismiss the petitions to adopt; and (3) ordered that DSS retain physical and legal custody of the three minor children. Petitioners appeal.

On appeal, petitioners have raised forty-one assignments of error. Seven of these are not raised in petitioners' appellate brief and are therefore deemed abandoned. N.C.R. App. P. 28(b)(6). The remaining assignments of error are condensed into the following three issues: (1) whether the trial court erred in concluding that DSS did not consent to the adoption of the three minor children by petitioners; (2) whether the trial court's findings are supported by competent evidence and whether the findings support the legal conclusions; and (3) whether the trial court erred in admitting certain evidence and refusing to admit certain other evidence.

Initially, we note that adoption proceedings are "heard by the court without a jury." N.C. Gen. Stat. § 48-2-202 (2001). "Our scope of

review, when the Court plays such a dual role, is to determine whether there was competent evidence to support its findings of fact and whether its conclusions of law were proper in light of such facts." *In re Norris*, 65 N.C. App. 269, 275, 310 S.E.2d 25, 29 (1983), *cert. denied*, 310 N.C. 744, 315 S.E.2d 703 (1984).

I.

[1] Petitioners first argue that the trial court's order is reversible because the trial court erred in finding that petitioners offered "[n]o competent evidence" that DSS had "executed a written consent for Petitioners to adopt the children in question in compliance with [N.C. Gen. Stat. §] 48-3-605(d)," and because the trial court erred in concluding that "DSS did not consent to the adoption of the children." We disagree.

Pursuant to N.C. Gen. Stat. § 48-3-601(3)(a) (2001), in all cases in which an agency has placed the minor for adoption, the agency must give its consent to a petition to adopt (unless consent is not required under N.C. Gen. Stat. § 48-3-603). Specifically, consent by an agency must be "executed by the executive head or another authorized employee" of the agency, and "must be signed and acknowledged under oath in the presence of an individual authorized to administer oaths or take acknowledgments." N.C. Gen. Stat. § 48-3-605(d). Here, although there was conflicting testimony at the hearing as to whether consent forms had been prepared and signed by DSS, there was no evidence that any prepared and signed consent forms were acknowledged under oath. Thus, the trial court's specific finding that there was no competent evidence that DSS had "executed a written consent for Petitioners to adopt the children in question in compliance with [N.C. Gen. Stat. §] 48-3-605(d)," is supported by the evidence.

Moreover, the statutory scheme mandates that, "[a]t the time the petition is filed, the petitioner shall file or cause to be filed . . . [a]ny required consent . . . that has been executed," N.C. Gen. Stat. § 48-2-305(2) (2001), and further mandates that, before granting an adoption petition, the court must make a finding that "[e]ach necessary consent . . . has been obtained and filed with the court," N.C. Gen. Stat. § 48-2-603(a)(4) (2001). There is no evidence in the record that petitioners filed or caused to be filed any executed consent forms from DSS at the time the petitions were filed, or at any time thereafter. In fact, petitioners have not assigned error to the trial court's finding that "[n]o written consent executed by DSS was filed or caused to be filed by the Petitioners pursuant to N.C. Gen.

Stat. [§] 48-2-305[(2)] at the time the adoption petitions were filed." We hold that the trial court's conclusion that DSS did not consent to the adoptions was supported by the findings.

**[2]** Even assuming *arguendo* that the evidence established that DSS had executed consent to the adoptions, and that petitioners had filed or caused to be filed executed consent forms by DSS, the trial court's ultimate determination to dismiss petitioners' petitions for adoption would not be reversible on this basis. One of the primary purposes of Chapter 48 of our General Statutes is "protecting minors from placement with adoptive parents unfit to have responsibility for their care and rearing." N.C. Gen. Stat. § 48-1-100(b)(1) (2001). More specifically, N.C. Gen. Stat. § 48-3-502(b) (2001) provides:

> Before a decree of adoption becomes final, the agency may for cause petition the court to dismiss the adoption proceeding and to restore full legal and physical custody of the minor to the agency; and the court may grant the petition on finding that it is in the best interest of the minor.

N.C. Gen. Stat. § 48-3-502(b). Moreover, N.C. Gen. Stat. § 48-2-604(a) (2001) provides:

> If at any time between the filing of a petition to adopt a minor and the issuance of the final order completing the adoption it appears to the court that the minor should not be adopted by the petitioners or the petition should be dismissed for some other reason, the court may dismiss the proceeding.

N.C. Gen. Stat. § 48-2-604(a). Thus, the trial court had full statutory authority to dismiss the petitions for adoption based on the best interests of the three minor children regardless of whether DSS had previously consented to the adoptions. This assignment of error is overruled.

II.

**[3]** Petitioners next argue that certain findings were not supported by competent evidence, and that certain conclusions were not supported by the findings. We have carefully reviewed the record and the assignments of error, and have determined that it is not necessary to address each and every one of petitioners' assignments of error concerning the trial court's numerous findings and conclusions. This is because we believe the testimony described in detail below fully supports certain critical findings by the trial court (also set forth below),

and that these findings fully support the trial court's conclusion of law that adoption by petitioners would not be in the best interests of the three minor children.

Art McRoberts testified that on 27 August 2000 he witnessed Mr. Cunningham, who was "out of control," cursing at a boy, later identified as Charlie, on his property, using the words " 'fuck' " and " 'fucker.' " He turned away and, when he looked back, he saw Charlie on the ground. Mr. Cunningham continued to scream at Charlie, and kicked Charlie in his side with the toe of his shoe at least three times. Mr. McRoberts subsequently reported the incident to DSS.

Gail Langford, a child protective services investigator for Wake County Department of Human Services, testified as follows. Following Mr. McRoberts' neglect report filed against petitioners on 27 August 2000 pertaining to the incident involving Charlie, Ms. Langford conducted an investigation in order to determine whether the neglect allegation could be substantiated. Ms. Langford conducted interviews with: the four foster children who were placed with petitioners at that time (Charlie, Clayton, Shawn, and Charee); three children who had previously resided with petitioners (Danielle, Cherokee, and Tonya); petitioners; Mr. McRoberts; and an additional neighbor. Ms. Langford documented the results of her investigation in a report, which report was admitted in evidence over petitioners' objection on the grounds of hearsay. Petitioners do not assign error to the admission of Ms. Langford's testimony, or her report, on appeal.

Ms. Langford testified that Charlie told her the following about the 27 August 2000 incident. Petitioners had been upset with Charlie because he had eaten some of Mr. Cunningham's cereal, did not put some clothes away, and left a dirty bowl in his bedroom. Mr. Cunningham said to Charlie, " '[g]et out of my face, get out of my house, go out the door. Don't come back.' " Charlie left the house and Mr. Cunningham followed him and yelled, " '[m]otherfucker, get back inside.' " As Charlie was walking back to the house, he tripped and fell. Mr. Cunningham " 'nudged . . .' " Charlie with his foot three times, twice on Charlie's side and once on Charlie's thigh. Mr. Cunningham pulled him up by both arms, held one of Charlie's arms, and directed him to the garage. Charlie also added that Mr. Cunningham was very angry that morning and had "ripped the Nintendo wires from the television set" because Clayton was not getting ready for church.

**IN RE ADOPTION OF CUNNINGHAM**

[151 N.C. App. 410 (2002)]

Ms. Langford testified that Clayton told her that Mr. Cunningham had pushed Charlie down, and that he saw Mr. Cunningham "kick Charlie one time." Clayton also told her that Mr. Cunningham had kicked Charlie before. Ms. Langford testified that Mr. Cunningham told her that he had grabbed for Charlie's arm, had accidentally hit him in the side causing Charlie to fall to the ground, and had nudged Charlie once with the side of his shoe while saying, " '[g]et in the house.' " Ms. Cunningham told Ms. Langford that she saw Mr. Cunningham administer "several short kicks of about 12 inches with the toe of the shoe." Ms. Cunningham's testimony was consistent with the testimony of Mr. McRoberts who had witnessed the incident.

Ms. Langford also testified to the following: that Danielle and Cherokee told her that, on one occasion, Mr. Cunningham had told Cherokee to leave the table because she would not eat her potatoes, and that as she walked up the stairs, he followed her "kicking her up the stairs, his foot on her buttocks as she went up the stairs"; that on this occasion, Mr. Cunningham followed her upstairs to the bathroom, slammed the door, put his hand on her neck and yelled at her; that Cherokee told her that Mr. Cunningham, on one occasion, "told Cecily to shut up and he kicked her"; that Jacob told her that Mr. Cunningham had kicked him on one occasion while Jacob was lying on the floor; that Charlie told her that petitioners had made Cherokee "swish vinegar in her mouth" because she had not told petitioners that she had wet her bed; that Cherokee told her Mr. Cunningham had spanked her on one occasion causing her to wet the bed, and that she was then made to sleep in her wet pants and on the wet sheets; that Charlie and Danielle told her that Mr. Cunningham had slapped Charlie in the face on one occasion; that Charlie, Cherokee and Danielle told her that Mr. Cunningham had spanked Charlie with a belt occasionally; that Shawn told her that he had been spanked once; that Charlie, Shawn and Charee told her that Clayton had been "popped with a hand on his buttocks"; that Clayton told her Mr. Cunningham had "hit him on his buttocks with a belt," and Ms. Cunningham spanked him with her hand.

Ms. Langford further testified that petitioners acknowledged that Mr. Cunningham had a temper and often lost his temper and sometimes cursed at the children, and that they spanked the children with their hands and with a belt, but that petitioners contended they had not done so since DSS had changed their policy to prohibit physical discipline. Ms. Langford testified that Charlie told her that he tends to cry when he sees his biological family, and that Mr. Cunningham

"calls him a baby or a girl if he cries." She also testified: that Clayton told her Mr. Cunningham had pushed Ms. Cunningham in the kitchen causing her to fall and cut her knee; that Danielle told her that Mr. Cunningham yells and curses at Ms. Cunningham; that Charlie told her that he has heard Mr. Cunningham call Ms. Cunningham a "fucking bitch"; and that Mr. Cunningham admitted to calling his wife "a bitch."

After completing her investigation, Ms. Langford met with five other staff members from her organization and together they unanimously concluded that there was sufficient evidence to substantiate allegations of neglect for improper supervision specifically as to the incident involving Charlie, and neglect for injurious environment as to Charlie, Clayton, Shawn and Charee.

Petitioners have not challenged the admission of the testimony offered by Mr. McRoberts or Ms. Langford on appeal, which testimony fully supports the following critical findings by the trial court:

8. On August 27, 2000, Art McRoberts . . . observed [Mr. Cunningham] yelling and cursing at Charlie America, a thirteen year old foster child then living in the Cunningham home. [Mr. Cunningham] used the terms "fuck" and "fucker" toward Charlie . . . [and was] out of control with anger. . . . Mr. McRoberts . . . saw Charlie . . . lying on the ground. [Mr.] Cunningham then kicked or nudged Charlie . . . with the toe of his shoe between three and six times. . . . [Mr. McRoberts'] testimony in open court regarding the incident . . . was credible.

. . .

12. Petitioners admitted that [Mr.] Cunningham used his foot against Charlie . . . while Charlie was on the ground . . . . [Mr.] Cunningham's use of his foot to discipline Charlie was inappropriate.

. . .

14. An investigation on behalf of DSS substantiated an allegation of neglect for improper discipline as to Petitioners because of the incident reported by [Mr.] McRoberts. An allegation of environment injurious to the well-being of [the] children was also substantiated as to Petitioners' home.

15. It was not unusual for [Mr.] Cunningham to lose his temper with foster children and become enraged.

16. [Mr.] Cunningham kicked foster children before the August 27 incident.

17. [Mr.] Cunningham has yelled and cursed at Shawn . . . and Charee . . . while they were foster children in his care. [Mr.] Cunningham has also yelled and cursed at Clayton . . . .

18. Petitioners . . . have used physical discipline, including whipping with a belt, on foster children in their home . . . .

19. Petitioners . . . have used other inappropriate forms of discipline for foster children, including requiring children to hold vinegar in their mouths.

20. At least one episode of domestic violence has occurred in Petitioners' home. Specifically, [Mr.] Cunningham pushed [Ms.] Cunningham down in their kitchen during an argument. [Ms.] Cunningham hurt her knee as a result of this episode, which was observed by Clayton . . . .

. . .

22. [Mr.] Cunningham's temper and history of using improper physical force against children and against his wife creates a substantial danger that future physical and emotional harm could occur to children living in the Cunningham household.

. . .

23. The attitude and conduct of Petitioners with respect to physical discipline, domestic violence and verbal abuse toward foster children in their care demonstrates a lack of understanding by Petitioners of appropriate parenting skills. . . .

We hold that these findings are supported by competent evidence in the record, and that they support the trial court's conclusion that adoption by petitioners would not be in the best interests of the three minor children. For this reason, we need not reach petitioners' numerous other assignments of error as to various other findings by the trial court, since reversal would not be warranted even if such other findings were not supported by competent evidence in the record.

III.

[4] Finally, petitioners argue that the trial court erred in admitting certain evidence and refusing to admit certain other evidence. Petitioners assign error to the trial court's admission of: (1) certain

**IN RE ADOPTION OF CUNNINGHAM**

[151 N.C. App. 410 (2002)]

testimony by Anne Verdin, an adoption worker employed by DSS, on the grounds that the testimony constituted hearsay, and that Ms. Verdin lacked sufficient personal knowledge and was not qualified as an expert; (2) a report regarding a foster child named Jacob, and accompanying photographs of Jacob's bruises, which formed the basis of a complaint filed against petitioners in April 1996 alleging that Jacob had been abused, on the grounds that the report contained hearsay and no foundation was established for admission of the photographs; (3) testimony by Dr. Vivian Denise Everett, director of the Child Sexual Abuse Team at Wake Medical Hospital, regarding her examination of a foster child named Cecily, on the grounds of hearsay. We need not address these assignments of error because, as noted above, we conclude that the testimony offered by Ms. Langford and Mr. McRoberts fully supports the critical findings set forth above, and that such findings support the trial court's ultimate determination in the matter. In other words, even assuming *arguendo* that the evidence identified by petitioners should not have been admitted, and that the findings based upon such evidence were therefore not supported by competent evidence in the record, such determination would not warrant reversal.

[5] Petitioners also contend that the trial court erred in excluding the juvenile files of five foster children (Cecily, Danielle, Cherokee, Charlie, and Jacob), and the mental health records of two foster children (Danielle and Cherokee). Petitioners argue that they were prejudiced by the exclusion of this evidence because the files and mental health records "would certainly be relevant for purposes of care and treatment by the Petitioners and the health history and veracity of the children." Petitioners have failed to indicate precisely how such evidence would have influenced the trial court's decision in this matter. Evidence of favorable "care and treatment" of the children by petitioners would not have negated the plenary evidence of neglect offered during the hearing, and petitioners' mere speculation that such files might contain evidence pertaining to the veracity of the children is insufficient to compel the conclusion that the exclusion of such evidence constitutes reversible error.

For the reasons stated herein, we affirm the trial court's order dismissing the adoption petitions.

Affirmed.

Judges WYNN and THOMAS concur.